Lisa HARLEY, Plaintiff,

v.

Michael McCOACH, et al., Defendants.

No. 95–CV–2001.

United States District Court,
E.D. Pennsylvania.

June 12, 1996.

Timothy I. McCann, Linda A. Carpenter, McCann Mailey & Geschke, P.C., Philadelphia, PA, for Plaintiff.

Mark B. Peabody, PECO Energy Company, Philadelphia, PA, Edward T. Ellis, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Defendants.

### *MEMORANDUM AND ORDER*

JOYNER, District Judge.

#### I

This Memorandum and Order resolves the motion for summary judgment filed by Defendant PECO Energy Company ("PECO") in this employment discrimination action brought by Lisa Harley, an African-American woman and PECO employee. This Court is authorized to award summary judgment "if the pleadings, depositions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In order to survive a summary judgment motion, the non-moving party must raise "more than a mere scintilla of evidence in its favor" and may not merely rely on unsupported assertions, conclusory allegations, or mere suspicions. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986)). Boiled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submis-

sion [of the evidence] to a jury." *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

## II

The facts educed during discovery, presented in the light most favorable to the plaintiff, are as follows. PECO hired Ms. Harley in 1981 and assigned her to work as a "stockman" at a PECO warehouse located in Berwyn, Pennsylvania in May of 1992. Ms. Harley is one of just two women out of 35 people who work at the Berwyn warehouse. Each stockman is required to work in one of five work assignment areas—retail, wholesale, receiving, inventory, and the yard. The stockmen are assigned to these areas on a rotational basis, with each assignment period lasting two months. The retail, wholesale, receiving, and inventory areas are indoor assignments, requiring the employee to work in the warehouse, while the yard area is an outdoor assignment. Ms. Harley worked indoors during the first eight months of her tenure at the Berwyn warehouse, and was scheduled to rotate outdoors to the yard for the January and February 1993 time period.

On January 4, 1993, the first day that she was scheduled to begin working in the yard, Ms. Harley called in sick and did not report for work. The following day, she presented her supervisor with a note from her doctor stating that she suffered from "recurrent upper respiratory infections" and that her health would be at risk if she were to work outdoors in the extreme cold. As a result, Ms. Harley was placed on modified duty, which made her ineligible for overtime, and was assigned to an indoor position. Ms. Harley complained about her ineligibility for overtime. After some discussion with the doctors involved, it was decided that Ms. Harley would not work outside if the temperature dipped below thirty-two degrees Fahrenheit.

On January 14, 1993, while the discussions regarding her fitness for outdoor duty were ongoing, Ms. Harley went to a first-level supervisor, Andy Alba, and complained that she had been subjected to harassment. On the following day, Ms. Harley met for four hours with the Manager of Materials Management, Andy Serrill, and the Human Resource Manager for Materials Management, Carol Asselta. Ms. Harley related to them a number of specific incidents that she regarded as harassment, including: (1) a male worker walked past her and "passed gas," then turned to see her reaction, laughed and walked away; (2) a supervisor, Michael McCoach, walked directly behind her, and when Ms. Harley turned around, he grabbed her arm and rubbed it, saying "I'm not following you"; and (3) a worker named Ken Schiller put his arm around her and said "Hi Sweetheart" on several occasions, prompting Ms. Harley to remove his arm. Ms. Harley also reported that a number of the male employees often engaged in crude and vulgar behavior in her presence, including: (1) a male worker made a gesture suggesting masturbation to other male workers; (2) a male worker placed his tongue in another male worker's ear; (3) a male worker ate a danish out of another male worker's mouth; (4) a male worker thrust his pelvis against another man's buttocks so as to simulate a sexual act.

Ms. Harley has submitted evidence from which a factfinder could infer that this sort of crude behavior was widespread. From the declaration of Mr. Alba:

> 4. The sexually offensive conduct of the workers was constant. Workers were always grabbing each other in offensive ways, tongueing each other's ears, eating danish pastries in ways that simulated oral sex, "humping" each other (one man pressing his pelvis against another man's buttocks to simulate a sexual act), telling sexually oriented jokes, making sexually oriented comments to and about each other, using profanity, openly displaying sexually oriented magazines and a host of other offensive activities. . . .
>
> 5. The conduct described above occurred in the presence of Lisa Harley and supervisors [in the warehouse]. The supervisors did nothing to stop this behavior. There was no support from senior management to changing the environment.

Alba Decl. ¶¶ 4–5.

Ms. Harley stated that she was the object of the unwanted attentions of a worker named Jamie Mazzacano, who would follow

her around "like a puppy dog." The other workers teased her about it, placing a sticker on her truck that read "Jamie's main squeeze." She also reported an incident in which a worker named Rocco Moyer thrust his pelvis and crotch against her backside as he passed behind her. Further, Ms. Harley informed Mr. Serrill and Ms. Asselta that workers were circulating a rumor to the effect that she and a white employee named Joe McConnell were engaged in an extramarital affair. There is also evidence relating to electronic mail she received from Mr. McCoach in which Ms. Harley was addressed as "Dear Brown Sugar." Finally, Ms. Harley described two incidents immediately preceding her complaint in which another employee almost struck her with a forklift.

Following the meeting of January 15, 1993, Mr. Serrill and Ms. Asselta launched an investigation of Ms. Harley's claims. Ms. Harley was immediately transferred from her department, Department 303, to Department 338 pending completion of the investigation. On February 16, the investigators interviewed the five first-line supervisors working in the warehouse, and later interviewed Messrs. Moyer and Schiller. Based on these interviews, PECO's investigators were able to verify a number of Ms. Harley's factual assertions. For example, the investigators concluded that some minor instances of profanity, wrestling, and homosexual taunting had occurred. None of this activity was directed at Ms. Harley, however; and the investigators concluded that it did not rise to the level of harassment. The other instances of which Ms. Harley complained could not be verified. Mr. Schiller denied putting his arm around her. Mr. Moyer denied rubbing his crotch against Ms. Harley's rear end, insisting that the contact amounted to nothing more than a bump. Mr. McCoach denied sending her the "Brown Sugar" electronic mail message.

Ms. Harley contends that the investigators failed to examine the circumstances surrounding a number of other incidents that she had reported to Mr. Serrill and Ms. Asselta, including: (1) Mr. Schiller told Ms. Harley that she need not worry about injury after falling on her chest, since "you don't

have anything up there"; (2) Mr. Schiller slid a raffle ticket down the front of his pants, rubbed his pants, pulled the ticket out of his pants and placed it in his mouth, all in Ms. Harley's presence; (3) a male worker began to undress in front of her; and (4) male employees would often read pornographic materials and wear tee-shirts displaying sexually explicit messages in the workplace. There is no evidence to suggest that PECO investigated or took remedial steps with respect to these allegations.

Notwithstanding its conclusion that Ms. Harley's harassment claim could not be substantiated, PECO enacted a variety of remedial measures after completing the investigation. It required all employees in the department to undergo sexual harassment refresher training, during which employees were instructed to refrain from engaging in offensive behavior. PECO supervisors were instructed to conduct safety meetings regarding forklift usage. The three workers who had allegedly made physical contact with Ms. Harley received individual counseling. Further, Mr. Serrill ordered that the electronic mail capability be removed from the warehouse computer system to prevent its abuse by the stockmen.

On April 5, 1993, Mr. Serrill and the other investigators met with Ms. Harley and informed her of the results of the investigation. Mr. Serrill also notified Ms. Harley that she would be required to return to Department 303. Ms. Harley strongly opposed reassignment to Department 303, based upon her perception that the workers there resented her for raising the harassment claim. She expressed these sentiments to Mr. Serrill, and also informed him that Mr. McConnell had heard Mr. Moyer state that he "would shoot Lisa in the head" if she returned to Department 303. Mr. McConnell also heard Mr. McCoach state that "if that n***** ever came back here, she'll be gone," although it is not clear whether Ms. Harley notified Mr. Serrill of this comment. At any rate, Mr. Serrill elected to delay Ms. Harley's reassignment to Department 303 until PECO's Security Department could investigate the alleged threats made against her. The Security Department interviewed Mr. McConnell,

who refused to identify the person who made the alleged threat. Mr. McConnell stated that he did not believe that the person who made the threat seriously considered harming Ms. Harley. The Security Department then interviewed Mr. Moyer, who denied making any threat and stated that he considered Ms. Harley his friend. Thus, PECO concluded that the death threat could not be substantiated.

Ms. Harley was permitted to remain in Department 338 through the summer of 1993, while a permanently-assigned Department 338 employee was on medical leave. When the other employee returned on September 20, Ms. Harley was informed that she would be reassigned to Department 303 beginning on September 27. On October 1, Ms. Harley took disability leave for depression. She returned to work in January 1994, after PECO allowed her to transfer to the Customer Service Department. She has incurred no loss of pay, benefits, or status as a result of the above-described events.

On April 5, 1995, Ms. Harley submitted a six-count complaint, naming as defendants PECO, Michael McCoach, Andy Serrill, and John O'Brien. In Count I, Ms. Harley alleges that the defendants subjected her to a racially and sexually hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e—2000e–17 (1994). In the second count, Ms. Harley asserts that the defendants retaliated against her for engaging in activity protected by Title VII. The third and fourth counts contain claims mirroring Counts I and II, and are brought under the Pennsylvania Human Relations Act, 43 Pa.Cons.Stat.Ann. §§ 951–63 (1991) (the "PHRA"). Ms. Harley alleges in Count V that the defendants discriminated against her and retaliated against her on the basis of her race in violation of 42 U.S.C. § 1981. Finally, in Count VI, Ms. Harley asserts that the defendants are liable to her under the tort theory of intentional infliction of emotional distress. PECO argues in the instant motion that it is entitled to an award of summary judgment as to each of Ms. Harley's claims. We turn now to address the merits of PECO's motion.

## III

### A. Hostile Work Environment

As noted above, Ms. Harley seeks relief under both Title VII and the PHRA, alleging that PECO subjected her to a work environment that was both racially and sexually hostile. Claims brought under the PHRA are analyzed under the same standards that have evolved under Title VII. *Brennan v. National Tel. Directory Corp.*, 881 F.Supp. 986, 994 n. 5 (E.D.Pa.1995); *Doe v. Kohn Nast & Graf, P.C.*, 862 F.Supp. 1310, 1323 (E.D.Pa.1994). In addition, race-based hostile work environment claims are evaluated under the same analysis used for gender-based claims. *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 753 (3d Cir.1995); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990). Finally, racial discrimination claims brought under 42 U.S.C. § 1981 are examined in the same manner as are claims brought under Title VII. *Parsons v. Philadelphia Coordinating Office of Drug & Alcohol Abuse Programs*, 833 F.Supp. 1108, 1115 (E.D.Pa.1993). Ms. Harley's Title VII, PHRA, and § 1981 claims all fall under the same analytical framework, and will therefore be examined together.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race [or] ... sex." 42 U.S.C. § 2000e–2(a)(1). The United States Supreme Court has concluded that a plaintiff may establish a Title VII violation if she can show that discrimination based on race or gender created a hostile or abusive working environment. *Patterson v. McLean Credit Union*, 491 U.S. 164, 180, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). In order for a plaintiff to recover under Title VII, the defendant must have subjected her to conduct that rises above that which is merely offensive or annoying; the conduct implicates Title VII only if it is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' "

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (quoting *Meritor*, 477 U.S. at 67, 106 S.Ct. at 2405).

■ The Third Circuit Court of Appeals has set forth a five-part test for the district courts to apply in hostile work environment cases. Accordingly, a black female Title VII plaintiff can successfully bring a race- or gender-based discrimination claim against her employer only if she shows that (1) she suffered intentional discrimination on account of her race or gender; (2) the discrimination was pervasive and regular; (3) she was detrimentally affected by the discrimination (the subjective standard); (4) the discrimination would have detrimentally affected a reasonable person in the plaintiff's position (the objective standard); and (5) the existence of respondeat superior liability. *Andrews*, 895 F.2d at 1482; *see West*, 45 F.3d at 753; *Spain v. Gallegos*, 26 F.3d 439, 447 (3d Cir. 1994) (applying *Andrews* test).

### 1. *Gender–Based Claims*

PECO argues that it is entitled to summary judgment as to Ms. Harley's gender-based claims because: (1) the alleged discrimination was objectively not pervasive and regular and not gender-based; and (2) there can be no respondeat superior liability.

#### a. *Nature of Alleged Discrimination*

■ In determining whether a work environment is objectively hostile, courts are not to examine the scenario on an incident-by-incident basis, but are instead to consider the totality of the circumstances. *Andrews*, 895 F.2d at 1484; *Stair v. Lehigh Valley Carpenters Local 600*, 813 F.Supp. 1116, 1119 (E.D.Pa.1993). An objectively hostile work environment can arise from the frequent use of insulting and derogatory language relating to women or from the pervasive display of pornography in common areas in the workplace. As our Court of Appeals has remarked, "[o]bscene language and pornography quite possibly could be regarded as 'highly offensive to a woman who seeks to deal with her fellow employees and clients with professional dignity and without the barrier of sexual differentiation and abuse.'" *Andrews*, 895 F.2d at 1485–86 (quoting *Bennett v. Corroon & Black Corp.*, 845 F.2d 104, 106 (5th Cir.1988), *cert. denied*, 489 U.S. 1020, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989)).

■ Upon review of the facts presented by the parties, we conclude that Ms. Harley has raised an issue of fact as to whether she endured a sexually hostile work environment. The record reflects that a number of the male workers assigned to Department 303 engaged in conduct that can charitably be described as both vulgar and offensive. There is evidence to suggest that they openly displayed pornographic magazines, wore tee-shirts depicting sexually explicit messages, simulated various sexual acts in the workplace, intentionally passed gas in her presence, and spread rumors concerning sexual liaisons involving Ms. Harley. Moreover, there is evidence of other workers directing offensive conduct particularly at Ms. Harley, including the male employee who allegedly rubbed his genitals against her backside, the employee who repeatedly put his arm around her and called her "Sweetheart," the employee who slid the raffle ticket down the front of his pants, and the employees who operated the forklifts in such a manner as to place her in harm's way. Considering this evidence in the light most favorable to Ms. Harley, we find that a jury could reasonably conclude that the plaintiff was compelled to endure circumstances sufficiently severe as to alter the condition of her employment. Accordingly, a summary judgment award on the grounds that no reasonable woman would have been detrimentally affected by the conditions described above is not warranted.

■ In support of its motion, PECO argues that the majority of the incidents about which Ms. Harley complains should not be considered harassment, since they are either gender-neutral (the passing gas and forklift incidents) or are not based upon the plaintiff's gender (the simulated homosexual sex acts). PECO then contends that the remaining offending acts are not sufficiently pervasive or regular to implicate Title VII. This line of argument, however, seems to ignore the totality of the circumstances approach set forth in *Andrews*. As noted above, *Andrews* counsels the district court to focus on "the

overall scenario," *id.* at 1484, and holds that "the offensive conduct is not necessarily required to include sexual overtones in every instance ... to detrimentally affect a female employee." *Id.* at 1485. The key question therefore concerns not whether the conduct is sexual, but whether the conduct would detrimentally affect a reasonable woman in the plaintiff's position. *See id.* at 1486 ("Although men might find these actions harmless and innocent, it is highly possible that women may feel otherwise.") Accordingly, a court may not properly discount that part of the total scenario that does not include an explicit sexual component from its consideration of whether the plaintiff endured an objectively hostile workplace. In the present case, Ms. Harley has set forth evidence from which a jury could conclude that she endured a work environment that would detrimentally affect a reasonable woman in her position. Thus, we are not persuaded by PECO's initial argument in favor of summary judgment.

b. *Respondeat Superior*

 PECO also argues that even if Ms. Harley could show that she was subjected to a hostile work environment, it cannot be liable to her under the facts raised during discovery. The district courts have been instructed to apply principles of agency law when determining whether there exists respondeat superior liability. *Meritor,* 477 U.S. at 72, 106 S.Ct. at 2408. Thus, "if a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable." *Andrews,* 895 F.2d at 1486. The employer cannot be liable, however, if it promptly and adequately addressed the situation once it learned of the offending conduct. *See Bouton v. BMW of N. Am., Inc.,* 29 F.3d 103, 110 (3d Cir.1994) ("an effective grievance procedure—one that is known to the victim and that timely stops the harassment—shields the employer from Title VII liability for a hostile environment").

 PECO argues that *Bouton* shields it from Title VII liability because it had a grievance procedure in place, because Ms.

Harley was aware of the procedure, and because it promptly and effectively investigated the allegations once Ms. Harley raised them. The difficulty plaguing this line of argument, however, is that it assumes that an employer is under no duty to address an allegedly hostile work environment until the harassed employee makes a complaint. *Bouton* makes clear, however, that the employer must take "prompt remedial action *when the hostile environment is discovered*" in order to avoid liability. *Id.* at 110 (citing *Andrews,* 895 F.2d at 1486); *see Pittman v. Correctional Healthcare Solutions, Inc.,* 868 F.Supp. 105, 109 (E.D.Pa.1994) (employer will be liable if it had knowledge or constructive knowledge of sexually hostile work environment and failed to take remedial action).

In the instant case, Ms. Harley has raised evidence suggesting that supervisory personnel had knowledge of a hostile work environment prior to the time she made her complaints, yet took no action to address it. Mr. Alba states in his declaration that he raised the issue with his supervisors on number of occasions both before and after Ms. Harley's assignment to Department 303, but was rebuffed. Further, Mr. Alba asserts that the allegedly hostile environment was open and obvious to supervisors and management, who did nothing to stop the behavior. Thus, there is reasonable grounds for dispute as to whether PECO took prompt and effective remedial measures once it became aware of the allegedly hostile work environment. Accordingly, we must deny PECO's motion to the extent it seeks summary judgment as to Ms. Harley's gender-based Title VII and PHRA hostile work environment claims.

2. *Race–Based Claims*

 PECO also seeks summary judgment as to Ms. Harley's allegation that it violated Title VII, 42 U.S.C. § 1981, and the PHRA by subjecting her to a racially hostile work environment. As we noted above, these claims are analyzed under the same standard used to evaluate gender-based hostile work environment claims. In support of these claims, Ms. Harley points to the electronic mail message in which she was addressed as "Brown Sugar" and the allegation that she heard from Mr. McConnell that Mr.

McCoach had referred to her using the word "n\*\*\*\*\*." Ms. Harley also notes that other workers teased her about an alleged tryst between her and Mr. McConnell by referring to her as the Whitney Houston character in "The Bodyguard," a film that depicts an inter-racial love affair.

In *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853 (3d Cir.1990), the Third Circuit affirmed the district court's decision to award summary judgment in favor of the defendant as to the plaintiff's hostile work environment claim on the ground that the plaintiff was able to point to only two pieces of evidence suggesting a discriminatory bias against women. The court concluded that "two comments ... are insufficient, in and of themselves, to support a hostile environment claim. Hostile environment harassment claims must demonstrate a continuous period of harassment, and two comments do not create an atmosphere." *Id.* at 863; *see Henson v. Dundee*, 682 F.2d 897, 904 (11th Cir. 1982) (mere utterance of a racial epithet does not alter the terms and conditions of employment to a significantly serious degree to implicate Title VII). This reasoning applies here and compels an award of summary judgment in PECO's favor as to Ms. Harley's race-based hostile work environment claims. The three incidents Ms. Harley cites are insufficient to create an issue of fact as to whether she endured a racially hostile work environment. Accordingly, we will award summary judgment to PECO as to these claims.

## B. *Retaliation*

Ms. Harley has also brought retaliation claims under both Title VII and the PHRA. The relevant statutory provision reads as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3 (1994). To make out a prima facie retaliation claim under either Title VII or the PHRA, the plaintiff must show that (1) she engaged in a protected activity; (2) the employer took an adverse employment action against her subsequent to or contemporaneous with such activity; and (3) there is a causal link between the protected activity and the adverse employment action. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir.), *cert. denied,* — U.S. —, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994); *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir.), *cert. denied,* 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993). Once this showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action. The burden then shifts back to the plaintiff to show by a preponderance of the evidence that the reasons offered by the employer are unworthy of credence and a pretext for discrimination. *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir.1986); *Kinnally v. Bell of Pennsylvania*, 748 F.Supp. 1136, 1143 (E.D.Pa.1990).

Upon review of the evidence submitted by the parties, we conclude that Ms. Harley has failed to identify facts sufficient to raise a prima facie case of retaliation. The first difficulty with the retaliation claims is that Ms. Harley fails to point to evidence of an adverse employment action that PECO took against her. In *Nelson v. Upsala College*, 51 F.3d 383 (3d Cir.1995), the Third Circuit held that the employer must take action that adversely affects the plaintiff with respect to an employment relationship, as opposed to conduct that the employee generally finds objectionable. *Id.* at 387–88. To illustrate its holding, the court cited cases such as *Lazic v. University of Pennsylvania*, 513 F.Supp. 761 (E.D.Pa.1981), in which defendant deleted positive references in plaintiff's personnel file after she filed a charge with the EEOC, and *EEOC v. Cosmair*, 821 F.2d 1085 (5th Cir.1987), where the employer discontinued severance payments once the employee filed a complaint with the EEOC. The upshot of the cases cited by the Third Circuit is that a plaintiff cannot prevail on a retaliation claim unless the employer takes

some action that has a negative impact on a present or future employment relationship.

Ms. Harley argues that PECO retaliated against her by: (1) forcing her to undergo a medical examination regarding her fitness for outdoor duty; (2) forcing her to return to Department 303 after the conclusion of the investigation; and (3) compelling her to attend a sexual harassment awareness training refresher in which Mr. McCoach was an instructor. While Ms. Harley may have found these actions objectionable, we cannot say that they adversely affected her employment relationship with PECO. The undisputed evidence suggests that Ms. Harley suffered neither a decrease in pay or benefits nor a demotion to a lower position during the time period relevant to this lawsuit. Moreover, she does not allege that adverse comments appear in her evaluations, that her eligibility for promotion has been compromised, or that PECO has in any way altered her employee status.

■■■ Even if we were to find that the actions taken by PECO affected her employment relationship, we would conclude that Ms. Harley has failed to raise an issue of fact as to causation. A plaintiff may satisfy her burden at the prima facie stage by showing that the adverse employment action was close enough in time to the protected activity to give rise to an inference of retaliation. *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *Woods v. Bentsen*, 889 F.Supp. 179, 187 (E.D.Pa.1995). In *Woods*, this Court noted that "other courts generally hold that if at least four months pass after the protected action without employer reprisal, no inference of causation is created." *Id.* Accordingly, we held that "an adverse employment action, occurring a significant period of time following the exercise of rights afforded under Title VII, does not create an inference of causation in the absence of other evidence." *Id.* at 188.

The evidence before the Court reveals that Ms. Harley made her initial complaint to PECO in January 1993, and was not reassigned to Department 303 until September of that year. The time period between the two events is therefore too great to support an inference of retaliation. Moreover, since the filing of a complaint with the EEOC in November 1993 occurred after the alleged retaliatory act, there can be no causal link between those two events to support a retaliation claim. Accordingly, for this reason as well, we must award summary judgment to PECO with regard to Ms. Harley's retaliation claims.

### C. *Intentional Infliction of Emotional Distress*

■■■ While the Supreme Court of Pennsylvania has yet to specifically recognize the tort of intentional infliction of emotional distress, lower courts have permitted plaintiffs to proceed under the theory "where the conduct in question is so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." *Rinehimer v. Luzerne County Community College*, 372 Pa.Super. 480, 494, 539 A.2d 1298, 1305, *appeal denied*, 521 Pa. 606, 555 A.2d 116 (1988). Courts in Pennsylvania have applied the doctrine cautiously, permitting recovery only when the conduct is clearly outrageous. *Williams v. Guzzardi*, 875 F.2d 46, 52 (3d Cir.1989); *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.1988). Indeed, our Court of Appeals has recognized that conduct in the employment context almost never gives rise to recovery under this tort theory:

> As we noted in *Cox*, 861 F.2d at 395–96, "the only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is [sic] where an employer engaged in both sexual harassment and other retaliatory behavior against an employee." *See, e.g., Bowersox v. P.H. Glatfelter Co.*, 677 F.Supp. 307, 311 (M.D.Pa.1988). The extra factor that is generally required is retaliation for turning down sexual propositions.

*Andrews*, 895 F.2d at 1487. In light of this standard, Ms. Harley has clearly failed to raise evidence sufficient to create a jury issue as to her tort claim. *See James v. International Business Machines Corp.*, 737 F.Supp. 1420, 1427–28 (E.D.Pa.1990) (plaintiff who endured two years of relentless jok-

ing and harassment, and was called a "bitch" on two occasions, failed to raise a factual issue as to her intentional infliction of emotional distress claim). Accordingly, summary judgment will be awarded to PECO in this respect as well.[1]

## IV

For the reasons set forth above, PECO's motion for summary judgment will be denied as to Ms. Harley's gender-based hostile work environment claims, but granted in all other respects. An appropriate order follows.

### ORDER

AND NOW, this 12th day of June, 1996, upon consideration of Defendant PECO Energy's Motion for Summary Judgment, and the response thereto, it is hereby ORDERED, for the reasons set forth in the preceding Memorandum, that said Motion is GRANTED IN PART as follows:

1. Defendant PECO Energy is hereby awarded summary judgment as to the claims contained in Counts II, IV, V and VI of Plaintiff's Complaint;

2. Defendant PECO Energy is hereby awarded summary judgment as to the race-based hostile work environment claims contained in Counts I and III of Plaintiff's Complaint; and

3. Defendant PECO Energy's Motion is hereby DENIED in all other respects.

---

1. PECO cites *James v. International Business Machines Corp.*, 737 F.Supp. 1420, 1427 (E.D.Pa. 1990), and argues that the Pennsylvania Workmen's Compensation Act bars an employee from seeking recovery under the tort of intentional infliction of emotional distress. In light of our disposition of Ms. Harley's tort claim, however, we need not address PECO's argument.