Claudia S. SHERROD, Appellant,

v.

**PHILADELPHIA GAS WORKS.**

No. 02–2153.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit L.A.R. 34.1(a) Jan. 14, 2003.

Decided Jan. 29, 2003.

Before SCIRICA, BARRY and SMITH, Circuit Judges.

OPINION OF THE COURT

SMITH, Circuit Judge.

Claudia Sherrod appeals the District Court's grant of summary judgment in favor of Philadelphia Gas Works on her

claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et. seq.* and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. § 951 *et. seq.* For the reasons discussed herein, we will affirm the decision of the District Court.

## I. FACTS

Appellant, Claudia Sherrod, is an African–American woman who was born on September 9, 1940. Sherrod began working for the appellee, Pennsylvania Gas Works ("PGW"), in March of 1989, as a Junior Clerk in the Treasury Department. Sherrod was promoted several times, culminating in her promotion to Supervisor of the Bill Passing Department on September 27, 1997. When Sherrod was offered the promotion to Supervisor, she was told she would receive a salary of $38,500, below the minimum $40,705 advertised. Larry Hoffman, Vice President and Chief Accounting Officer and Sherrod's new supervisor, explained that this lower salary was based on the fact that she did not have experience with the material accounting system. However, when Sherrod actually assumed the position, she was given a salary of $40,000. She was later given an increase to $41,000, which was made retroactive to October 4, 1997. Appellant claims that Hoffman promised to raise her salary to $45,000 within six months, but that this did not occur.

When Sherrod assumed the position of Supervisor of Bill Passing, she inherited a huge backlog of unpaid bills. This problem was exacerbated by the fact that PGW was implementing a new accounting system known as ORACLE, and it was causing mass confusion. After ORACLE was installed, plaintiff took a stress-related leave of absence which lasted from December 2, 1998 to January 19, 1999. While she was on leave, Hoffman left PGW. In February, Tom Smyth took over as Chief Accounting Officer.

Sherrod took another leave of absence from March 1999 until July 1999. While out on leave, Sherrod told Ann Stewart, the manager of Staffing and Diversity, that she did not want to return to the Accounting Department because of Smyth's racism. Upon her return to work, Sherrod was transferred to the Public Affairs Department, to serve as "Community Relations Specialist." According to Sherrod, this new job had no duties because all of her assigned duties were already undertaken by James Emmanuel—another employee. Sherrod received the same pay and benefits in this position as she had in the Accounting Department. Nonetheless, she felt that her new position was humiliating and that people were laughing at her.[1] She resigned after seven months in this position.

### A. Disparate Treatment

Appellant claims she was paid a lower salary than similarly situated younger Caucasian employees and was eventually constructively terminated because of her race and age. Sherrod points out that both her temporary replacement in the position of Supervisor—Ann Breyer—and her permanent replacement—Daniel Andrews—were younger,[2] Caucasian and

---

1. Appellant was unable to specify exactly who she thought was laughing at her, stating "I can't be specific right now."

2. Breyer was born on April 1, 1952 and Andrews was born on July 22, 1956.

were paid more than she. Breyer assumed Sherrod's responsibilities while the latter was on FMLA leave from March to May of 1999, and was paid an annual salary of $64,000. Daniel Andrews replaced Sherrod in May of 1999 and was paid an annual salary of $53,000. Andrews did not have a four-year degree, and was unfamiliar with accounting. In addition, Kim Brennan, the Supervisor of Property Records, was younger and Caucasian, and she was paid $53,000 in 1999.[3]

### B. Hostile Work Environment

Appellant claims she was subject to a hostile work environment based on her race. Shortly after he arrived in February of 1999, Smyth said that "he didn't like the way they [Jim Smith and Darcel Young— two African–American clerks that Sherrod supervised] were eating at their desks, it must be their culture." Then, in July of 1999, Joe Bogdonavage, the Senior Vice President of Finance,[4] told Sherrod "if they [Smith and Young] don't do their work, I'm going to sit at their desks with a whip." In addition, the minority clerks' desks were placed directly in front of their white supervisor's office windows. Sherrod admitted that this was related to seniority, and that she did not really have any opinion as to whether it was racially motivated. Sherrod also claims that one of the reports she prepared for the CEO was thrown away by his secretary, that Smyth told a clerk in the department "don't do nothing she [Sherrod] tells you to do," and that other members of the management team would scream at her

and treat her badly. Sherrod claims that as a result of this hostile work environment, she had to go on leave and seek mental health treatment.

### C. Retaliation

Sherrod complained many times to Ann Stewart, prior to 1997, that she was being discriminated against based on her race and age. In March of 1999, Sherrod once again filed a written complaint with Stewart alleging racial and age-based discrimination. She claims that her constructive termination was in retaliation for these complaints.

### D. FMLA

On March 2, 1999, Sherrod requested thirty days of FMLA leave to begin on March 22, in order to care for her grandmother. Initially, the Director of Employee Services denied the request on the basis that one could not use FMLA leave to care for a grandparent. After appellant explained via e-mail on March 5, 1999 that her grandmother had raised her, the leave of absence was approved.[5] Instead of caring for her grandmother, however, appellant took sick leave in order to deal with stress and to address her own mental health issues. Appellant was out on leave from March 16, 1999 until July 1999.

## II.  PROCEDURAL POSTURE

Appellant filed a five count complaint alleging violation of Title VII, the ADEA, Section 1981, the FMLA and the PHRA.

---

3. In her factual summary, appellant describes facts that might be the basis for a disparate treatment failure to promote claim. Because appellant does not mention failure to promote in her legal analysis of disparate treatment, we will assume that dismissal of this claim is not being appealed.

4. Bogdonavage served as acting Chief Accounting Officer from the time that Hoffman was terminated until Smyth was hired.

5. Appellant suggested during her deposition that PGW should have been aware of this close relationship because she had taken FMLA leave to care for her grandmother back in 1994.

PGW moved for summary judgment on all counts, and the motion was granted by the District Court on March 29, 2002.

## III. JURISDICTION

The District Court had subject matter jurisdiction via 28 U.S.C. § 1331. This Court has jurisdiction over the appeal based on 28 U.S.C. § 1291.

## IV. STANDARD OF REVIEW

This court exercises plenary review over a district court's order granting summary judgment. *See Reitz v. County of Bucks,* 125 F.3d 139, 143 (3d Cir.1997). Summary judgment must be granted if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of fact exists "only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Although the moving party must initially point out the absence of evidence necessary to the non-moving party's case, once he has done so the burden shifts to the non-moving party to provide evidence to support each element of the party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must consider all evidence in the light most favorable to the non-moving party. *See Marzano v. Computer Sci.,* 91 F.3d 497, 502 (3d Cir.1996); *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988).

## V. LEGAL ANALYSIS

*A. Interference with rights under the FMLA*

■ The District Court dismissed appellant's FMLA claim, concluding that she was not retaliated against for taking FMLA leave because she did not suffer an adverse employment action. Appellant asserts that she did not have a retaliation claim, but that she was bringing a claim for the interference with her right to FMLA leave in March of 1999, because her claim was initially denied. Although PGW reversed its initial denial of leave once appellant clarified that her grandmother had raised her, appellant appears to believe that she is entitled to payment for her leave as a result of the initial denial. She therefore requests the $6,000 difference between her salary in 1998 and her salary in 1999.

The FMLA states that: "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). The FMLA does not define interference, but the Department of Labor regulations indicate that interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b).

FMLA leave does not extend to leave to care for grandparents unless the grandparent served as the employee's parent. *See* 29 U.S.C. § 2612 (granting leave to care for parent), § 2611(7) (defining parent as "the biological parent of an employee or an individual who stood in loco parentis to an employee when the employee was a son or daughter"). In addition, "[a]n employee giving notice of the need for unpaid FMLA leave must explain the reasons for the needed leave so as to allow the employer to determine that the leave qualifies under the Act." 29 C.F.R. § 825.208(a)(1). Since appellant did not initially tell her employer that her grandmother had raised her, she failed to sufficiently explain her reasons

for the needed leave so as to allow the employer to determine that her request was covered by the FMLA. Therefore, the initial denial of leave was not improper, nor was it so discouraging that it interfered with appellant's right to leave under the FMLA.[6]

### B. Disparate Treatment under Title VII, Section 1981, ADEA and PHRA

Appellant's claims of disparate treatment under Title VII, ADEA, PHRA and Section 1981 must be analyzed under the test articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Jones v. School District of Philadelphia,* 198 F.3d 403, 410 (3d Cir.1999) (Title VII, PHRA and Section 1981 claims governed by *McDonnell Douglas*); *Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir.2000) (ADEA and Title VII claims governed by *McDonnell Douglas*).

In order to make out a prima facie case, appellant must show that: 1) she is a member of a protected class; 2) she was qualified for her position; 3) she suffered an adverse employment action; and 4) that action occurred under circumstances giving rise to an inference of discrimination. *See Jones,* 198 F.3d at 410–11. If plaintiff establishes a prima facie case, the burden shifts to the defendant "to articulate some legitimate nondiscriminatory reason for the employee's rejection." *Id.* (quoting *McDonnel Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). Then, if defendant carries this burden, the plaintiff must show these reasons were not the true reasons, but were the pretext for discrimination. *See id.; Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

First, PGW asserts that plaintiff did not suffer any adverse employment action. An adverse employment action necessarily encompasses all tangible employment actions such as "hiring, firing, failing to promote, reassignment or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). In addition, paying an individual a lower salary for discriminatory reasons can be an adverse employment action. *See Stanziale v. Jargowsky,* 200 F.3d at 105. Thus, appellant argues that there are three adverse employment actions in this case: 1) a pay disparity between the amount advertised for Supervisor and the amount paid to appellant, 2) a pay disparity between appellant as Supervisor and her successors, and 3) a constructive discharge.

Constructive discharge occurs if the "conduct complained of would have the

---

**6.** Some district courts in this Circuit have suggested that an employee may bring an interference claim for actions which could "chill" desire to take FMLA leave, even when the employee takes the leave. *Compare Williams v. Shenango, Inc.,* 986 F.Supp. 309, 320–321 (W.D.Pa.1997) (where employer denied request for FMLA leave and suggested that employee take leave on a different week, but retroactively approved the leave after it was taken, reasonable person could conclude that employer interfered with FMLA rights); *Shtab v. Greate Bay Hotel and Casino, Inc.,* 173 F.Supp.2d 255, 267–68 (D.N.J.2001) (where authorization for FMLA leave was de- nied after leave occurred, noting that a jury could conclude that employer's suggestion that employee take different date of leave chilled plaintiff's assertion of rights under FMLA), *with Alifano v. Merck & Co., Inc.,* 175 F.Supp.2d 792 (E.D.Pa.2001) (plaintiff could not bring claim for interference in the absence of any adverse employment action where employer allegedly discouraged but did not deny leave). Nonetheless, appellant does not have a cause of action for interference in this case because she failed to give her employer sufficient notice that her FMLA requested leave qualified under the statute.

foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir.1992). In the case in which we first adopted the constructive discharge doctrine, *Goss v. Exxon Office Systems Co.*, 747 F.2d 885 (3d Cir.1984), we held that the work conditions were so intolerable as to constitute constructive discharge. There, the plaintiff was a sales representative for Exxon with a lucrative territory. Goss's supervisor began interrogating her about her plans to have a family. Goss then became pregnant twice, and each time her supervisor became verbally abusive and expressed doubts about the plaintiff's ability to combine motherhood and a career. Goss miscarried both times and, upon her return to work after the second miscarriage, her supervisor informed her she would either have to accept a new territory or resign. The Supervisor also described Goss as a "'wacko,' pregnant, and likely to leave." 747 F.2d at 888. We concluded that under these conditions a reasonable person in the employee's shoes would resign.

■ Here, even viewing all the evidence in the light most favorable to the appellant, the work conditions were not so severe that a reasonable person in the employee's shoes would resign. Appellant suggests that she had to resign because, although she requested her transfer, her new job duties were duplicative of those of another employee and people were laughing at her. Appellant does not allege that her new supervisor threatened her with demotion, in any way harassed her, or suggested she should leave. Accordingly, the mere fact that appellant felt her job was unnecessary and that unspecified people were laughing at her would not be "so unpleasant or difficult" to constitute constructive discharge.

As to the pay disparities between appellant and her successors, and between the advertised salary and the actual salary she received, PGW does not explain why these pay disparities did not constitute adverse employment actions. PGW does argue that appellant has not carried her burden to show that the reasons given by PGW for the pay disparities were pretextual. In order to show pretext, a plaintiff may introduce evidence from which a fact-finder could "(1) disbelieve the employer's articulated legitimate reason or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Abramson v. William Patterson College of New Jersey*, 260 F.3d 265, 283 (3d Cir. 2001) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)) To disbelieve the employer's proffered reason, the question is not whether the action was prudent, but whether appellant has shown "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence'[.]" *Fuentes*, 32 F.3d at 765 (internal quotation omitted).

■ PGW points to the fact that appellant received, for only one week, a lower salary than that advertised because she did not have all of the necessary job skills. This is a legitimate reason. Appellant suggests that this reason was pretext for age and/or race discrimination because Andrews, her successor, did not have experience in accounting and he was not given a lower salary. The fact that Andrews was paid a higher salary approximately one-and-a-half years later does not cast doubt on PGW's proffered reason for Sherrod's salary inasmuch as his lack of experience in accounting was countered by his greater supervisory experience; he had received a

higher salary in his previous position; and PGW had difficulty finding anyone willing to take the position after the chaos caused by implementation of ORACLE. Since the fact that Andrews was paid more than the advertised salary is insufficient for a reasonable fact-finder to conclude that PGW's proffered reason for paying Sherrod less was "unworthy of credence," appellant has not carried her burden to show pretext on this count.

■ With respect to the greater salaries paid to her successors, PGW explains that they had more experience and better qualifications. Daniel Andrews had been a supervisor in the Meter Reading Department for four years before becoming Supervisor of Bill Passing, and was already earning nearly $49,000 in that position. Ann Breyer had 20 years of management experience with PGW in departments such as Internal Auditing, Accounting and Budgets and Information Systems. Moreover, while Breyer temporarily assumed appellant's duties, she retained her primary responsibility to implement ORACLE. Accordingly, her position was hardly equivalent to the position held by Sherrod.[7]

Appellant notes, however, that she had a four-year degree and Andrews did not. Andrews was also unfamiliar with accounting. This evidence suggests that Andrews was not better qualified than appellant in every category. Yet, the fact that appellant's qualifications were superior in some other areas is not enough for a reasonable fact-finder to disbelieve PGW's explanation that Andrews was paid more because he had more years of supervisory experience. Appellant also introduced no evidence sug-

gesting that the reasons that Breyer was paid more were pretext. Therefore, the District Court's grant of summary judgment will be affirmed on this count.

### C. Hostile Work Environment under Title VII, Section 1981 and the PHRA

To establish a prima facie case of hostile work environment, appellant must show that (1) she suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would have detrimentally affected a reasonable person in the same position; and (5) the existence of respondeat superior liability. *See West v. Philadelphia Elec. Co.,* 45 F.3d 744, 753 (3d Cir.1995). Factors which may indicate a hostile work environment include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The analysis is the same whether under Title VII, Section 1981 or the PHRA. *See Harley v. McCoach,* 928 F.Supp. 533, 538 (E.D.Pa. 1996).

Appellant points to several incidents that allegedly show a racially discriminatory work environment. First, shortly after he arrived in February of 1999, Smyth said that "he didn't like the way they [Jim Smith and Darcel Young—two African—

---

7. Sherrod also points to Kim Brennan as someone in an equivalent position: Supervisor of Property Records rather than Bill Passing, who was Caucasian, younger than her (born on 4/19/67), and was earning more than her. PGW explains that Brennan had more management experience, including two years as an Internal Auditor before transferring to Property Records. In addition, Brennan's starting salary was less than Sherrod's. Brennan was earning $36,000 when she became a supervisor in July of 1996, while Sherrod earned $40,000 when she became a supervisor in September 1997.

American clerks that Sherrod supervised] were eating at their desks, it must be their culture." Second, in July of 1999, Joe Bogdonavage, another manager in the Bill Passing Department, told Sherrod "if they [Smith and Young] don't do their work, I'm going to sit at their desks with a whip." Third, the minority clerk's desks were placed directly in front of their white supervisor's office windows. Sherrod also claims that: one of the reports she prepared for the CEO was thrown away by his secretary; Smyth told a clerk in the department "don't do nothing she [Sherrod] tells you to do;" she was told not to attend a meeting despite the fact that her presentation was on the agenda; Ann Breyer turned her back on Sherrod to snub her; Smyth told Sherrod that if he was fired he would fire her as well; and other members of the management team would scream at her and treat her badly.

PGW argues that none of these incidents can reasonably be interpreted as acts of intentional discrimination against the plaintiff based on her race. PGW points out that Smyth testified that his "culture" comment was about corporate culture not racial culture, and after making this comment he established a work rule prohibiting all employees from eating at their desks. PGW also suggests that the "whipping" comment was unrelated to race and notes that Sherrod admitted that the clerk's desks were repositioned based on seniority. Finally, PGW argues that if any other members of the management team screamed at Sherrod or treated her badly, it was for reasons unrelated to race. For example, plaintiff admits that at one point Bogdonavage yelled at her because he believed that an employee had paid a PGW bill out of his own pocket. She also admits that some of the conflict with other managers was over her opinions about how to implement the ORACLE transition.

This Court has recognized that "the advent of more sophisticated and subtle forms of discrimination requires that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim." *Cardenas v. Massey*, 269 F.3d 251, 262 (3d Cir.2001). Assuming that Smyth's culture comment and Bogdonavage's whipping comment were racially motivated, these two incidents were not sufficiently severe and pervasive to establish a hostile work environment. *See Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 863 (3d Cir. 1990) (two sexually stereotyped discriminatory comments do not constitute continuous, pervasive discrimination). However, in light of these two comments, a reasonable fact-finder could find that all the facially neutral mistreatment of Sherrod by other members of the management team was related to race. *See Cardenas*, 269 F.3d at 262. Therefore, we must determine whether all of the alleged conduct was severe and pervasive enough to create a hostile work environment.

In *Cardenas*, the defendants subjected the plaintiff to ethnic slurs, dealt with disagreements by asking if the plaintiff intended to pull out a switchblade, wrote derogatory messages on the marker board in the plaintiff's cubicle, rounded the numbers on all other employees evaluations upward while rounding the plaintiff's evaluation numbers downward, disproportionately assigned minorities and trainees to the plaintiff's unit, gave plaintiff contradictory instructions and assignments incompatible with his staff resources, and spread the word that the plaintiff was an affirmative action hire. 269 F.3d at 258–59. This Court held that, looking at the totality of the circumstances, these activities were sufficiently severe and pervasive so as to

constitute a hostile work environment. *Cardenas,* 269 F.3d at 263. In *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1082–84 (3d Cir.1996), this Court once again found the alleged conduct sufficiently severe and pervasive to constitute a hostile work environment where African–American employees were referred to as "one of them" or "another one," told not to touch anything or steal anything, made to do menial jobs, screamed at, threatened with termination, had their time cards stolen, were falsely accused of wrongdoing, had information necessary to their jobs withheld, were given conflicting orders, and the general manager stated at a district meeting that "the blacks were against the whites" and that if they did not like it at Cort Furniture they could leave.

Appellant's showing falls short of the severe and pervasive conduct in *Cardenas* and *Aman.* Unlike the plaintiff in *Cardenas,* there is no evidence that anyone ever referred to appellant using racial slurs. The statements which Sherrod considered offensive were subject to a non-racial interpretation and were not physically threatening or humiliating. In addition, although appellant was excluded from one meeting, a report was thrown away, and a colleague told one clerk not to listen to Sherrod, there is no evidence suggesting that this unreasonably interfered with her work performance, as was the case in *Cardenas* and *Aman.* Finally, even if the conduct described had a detrimental effect on appellant's mental health, these incidents would not have detrimentally affected a reasonable person in appellant's position. Accordingly, these incidents are insufficient to create a racially hostile work environment as a matter of law.

#### D. *Retaliation for asserting claims*

Retaliation requires a plaintiff to show that (1) she engaged in a protected activity; (2) the employer took an adverse action against her; and (3) there is a causal link between the activity and the adverse action. *See Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194, 201 (3d Cir.1994). The definition of adverse employment action is the same in the retaliation and the disparate treatment context. *See Cardenas,* 269 F.3d at 263.

Appellant suggests that she was constructively terminated because she complained about age and race discrimination to Human Resources. Because, as discussed *supra,* appellant was not constructively discharged, she has not introduced any evidence from which a reasonable factfinder could conclude that PGW took adverse action against her because of her complaints.

### VI. CONCLUSION

The District Court's grant of summary judgment will be affirmed.