

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-10-1994

# Bouton v. BMW of North America, Inc.

Precedential or Non-Precedential:

Docket 93-5296

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Bouton v. BMW of North America, Inc." (1994). *1994 Decisions.* Paper 44.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/44

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NOS. 93-5296 & 93-5316


TRUDE S. BOUTON,

Plaintiff,

v.

BMW OF NORTH AMERICA, INC.,

Defendant.

Trude Bouton, Appellant in No. 93-5296

BMW of North America, Appellant in No. 93-5316


Appeal from the United States District Court
for the District of New Jersey


D.C. Civil No. 90-2884


Argued March 8, 1994

Before: MANSMANN, LEWIS and SEITZ, Circuit Judges.

Filed: June 10, 1994

Louis A. Bové (Argued)
Swartz, Campbell & Detweiler
1600 Land Title Building
100 South Broad Street
Philadelphia, PA  19110
    Attorney for Trude Bouton

Marilyn Sneirson (Argued)
Lynn B. Su
Thomas W. Dunn
Beattie Padovano
50 Chestnut Ridge Road
P. O. Box 244

Montvale, NJ  07645
    Attorneys for BMW of North America, Inc.

**OPINION OF THE COURT**

SEITZ, <u>Circuit Judge</u>.

Plaintiff, Trude Bouton, filed this action for sexual harassment under state and federal law seeking to hold BMW of North America, Inc. ("BMW") liable as her employer.  The district court entered judgment against Bouton on all claims.  As to her Title VII claims, which were tried to the court,[1] the district court held that there was no employer liability.  The court also ruled that the statute of limitations had expired on the only New Jersey state law claim on which the jury found in Bouton's favor and so entered judgment for BMW as a matter of law.  Finally, the court entered judgment on the jury's verdict in favor of BMW on the remaining claims; no appeal was taken on them.

---

[1] A jury trial was not available in Title VII actions when this suit was filed in July 1990. *Roebuck v. Drexel Univ.*, 852 F.2d 715, 737 n.40 (3d Cir. 1988).  The district court ruled that the Civil Rights Act of 1991 amendment to Title VII that provided access to juries did not apply retroactively.  The Supreme Court held in *Landgraf v. USI Film Products*, 62 U.S.L.W. 4255 (U.S. Apr. 26, 1994), that the jury trial provision should not be applied to cases complaining of pre-enactment conduct.

Bouton appeals the adverse judgments on one Title VII claim and the New Jersey Law Against Discrimination ("NJLAD") claim that was decided as a matter of law. BMW cross-appeals the NJLAD ruling, contending that even if the statute of limitations extended to the date of this action, the district court's judgment should be affirmed on other grounds because the facts do not support employer liability under New Jersey law.

## I.  Background

We first address the evidence having in mind that BMW is entitled to the benefit of disputed facts.

Trude Bouton was employed by BMW in July 1984 as a bilingual secretary to Karl Hammermueller, the company's Comptroller, and was promoted with him when he became Treasurer in August 1985. In early fall 1985, Bouton and Hammermueller began a personal relationship.

In April 1986, Bouton became Executive Secretary to the Vice President of Service, Hans Duenzl. Hammermueller's boss suggested the promotion in order to separate her from Hammermueller. In October 1986, Hammermueller moved into Bouton's home, where he lived until they broke up in December 1986.

Thereafter, Bouton took a medical leave. The incident that precipitated her medical leave occurred while she was typing as Duenzl dictated an urgent fax to Germany. It was after 5:00 p.m. on Friday in Germany, and after 12:00 noon in New Jersey. Bouton testified that she requested permission to go to the bathroom and he responded in the crudest terms but without any sexual connotation. Duenzl recalls that she asked to go to lunch and he refused because the recipients were waiting to begin their weekend in Germany. In any event, Bouton ran from the building, bypassed personnel, and went to Hammermueller's office. He summoned Steve Thompson from the Human Resources Department and she made her first contemporaneous complaint of harassment.

BMW investigated the complaint, even involving its President, by having him interview Duenzl. Although BMW could find no harassment, the Human Resources Department decided Bouton should not continue to work for Duenzl. While Bouton was still on the medical leave, BMW informed her that her request to be assigned to Carl Hooser, who had succeeded Duenzl, would be granted. Bouton was never again bothered by Duenzl—indeed, she became comfortable enough to complain to him about Hooser.

Bouton's credibility was seriously challenged both when she complained within BMW and at trial. For example, she testified that while she was cutting bagels for a staff meeting, "Mr. Duenzl approached me from the back, and I could feel he had an erection because he pushed hisself [sic] against my back." However, the female managers who regularly attended those staff meetings testified that bagels were never served—donuts were standard fare. Additionally, there was other conflicting testimony as to Bouton's attendance at company dinners.

After Bouton returned from medical leave, she began complaining about Hooser, her first American boss. She thought he was too informal—"too Californian," not a strong "German manager." Hooser restricted her overtime and criticized her secretarial skills and attitude. He insisted that they communicate in writing, which he explained was because her English was so poor that he needed a method of decreasing miscommunications. Bouton's self-typed autobiography illustrated her inferior secretarial skills. Additionally, both her written work and spoken transcripts portray sub-par proficiency with the English language.

A member of the personnel department surmised that these problems had not been so glaring to her previous bilingual bosses who valued her German skills and who may not have recognized the errors in English. Duenzl explained that he eventually learned her phrasing was poor and asked American managers to edit his correspondence. Thus, the jury could readily attribute Hooser's actions to the personality conflict and to Bouton's inadequacies as a secretary without reflecting any sexual motivation. Indeed, the record in this case fairly supports the conclusion that Hooser was very tolerant of Bouton when she tried to persuade the President of BMW to fire him. The jury evaluated its interpretation of this evidence by rejecting all of Bouton's complaints against Hooser.

With this background, we proceed to consider whether the District Court correctly absolved BMW of liability.

## II.    Title VII Employer Liability

Bouton argues that the district court's ruling against her Title VII claim is impermissibly inconsistent with the jury verdict favoring her NJLAD claim. BMW responds that the judge correctly applied collateral estoppel to facts found by the jury, but decided against her because she did not prove employer liability under Title VII.

Under both Title VII and NJLAD, a hostile environment claim requires proof of pervasive or severe intentional discrimination that affected the plaintiff and would also affect a reasonable person. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986); *Andrews v. City of Philadelphia*, 895 F.2d

1469, 1482 (3d Cir. 1990);[2] *Lehmann v. Toys `R' Us, Inc.*, 626 A.2d 445, 453 (N.J. 1993). However, Bouton sought to have BMW held liable rather than the harasser. Thus, she also had to show that employer liability was appropriate. At the time of the *Bouton v. BMW* trial, the New Jersey Supreme Court had not yet decided the principle governing employer liability under NJLAD. Because the district court predicted that New Jersey would adopt strict liability, it did not instruct the jury on employer liability. When the district court reached the Title VII decision, it applied the jury's findings to the first four elements, but then concluded that employer liability was not appropriate because "as soon as [BMW] knew of the conduct, it took prompt and adequate remedial measures." Op. at 18.

The United States Supreme Court has instructed courts to use agency principles when deciding employer liability for sexually hostile work environments. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72 (1986). *Meritor* rejects the possibility that employers are strictly liable for hostile environments and also repudiates the notion that a grievance procedure will automatically protect the employer. *Id.* at 72-73. The challenge

---

[2] We note that *Andrews*' formulation differs from *Meritor* in that *Andrews* suggests that the discrimination must be "pervasive and regular" whereas the Supreme Court described that element as "pervasive or severe." Both tests are met here so we do not find it necessary to resolve whether this was inadvertent although we understand that the distinction may be important. *See T.L. v. Toys `R' Us, Inc.*, 605 A.2d 1125, 1138 (App. Div. 1992), *aff'd as modified sub nom. Lehmann v. Toys `R' Us, Inc.*, 626 A.2d 445 (N.J. 1993); *id.* at 1145 (Skillman, J.A.D., concurring & dissenting); *Watts v. New York City Police Dep't*, 724 F. Supp. 99, 106 n.6 (S.D.N.Y. 1989).

before this court is to determine what middle ground remains in agency law.

The *Restatement (Second) of Agency* § 219 provides three potential bases for holding employers liable for sexual harassment perpetrated by their employees. Section 219(1) holds employers responsible for torts committed by their employees within the scope of their employment. Two of the four reasons listed in § 219(2) for imposing liability when an employee acts outside the scope of employment could also apply. Under § 219(2)(b), masters are liable for their own negligence or recklessness; in a harassment case, this is typically negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment. Finally, under § 219(2)(d), if the servant relied upon apparent authority or was aided by the agency relationship, the master is required to answer.

Under § 219(1), Bouton asserts that BMW is liable because Duenzl was acting within the scope of his employment. Scope-of-employment liability is often invoked in quid pro quo cases because the supervisor has used his authority over the employee's job to extort sexual favors. Without the agency relationship, quid pro quo harassment would be impossible, so the employer is responsible. *See, e.g., Karibian v. Columbia Univ.*, 14 F.3d 773, 777-78 (2d Cir. 1994), *petition for cert. filed*, 62 U.S.L.W. 3724 (U.S. Apr. 22, 1994) (No. 93-1674). However, in a hostile environment case, the harasser is not explicitly raising the mantle of authority to cloak the plaintiff in an unwelcome

atmosphere. Employer liability should not be imputed under § 219(1) without use of actual authority.

Courts of appeals that have spoken readily accept the negligence concept of § 219(2)(b) if the harassment is reported to the employer. Failure to investigate and remediate will result in employer liability. *See, e.g.*, *EEOC v. Hacienda Hotel*, 881 F.2d 1504 (9th Cir. 1989); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 903 (1st Cir. 1988). Conversely, under negligence principles, prompt and effective action by the employer will relieve it of liability. In *Andrews*, this court joined other circuits in interpreting these principles to impose liability when the employer knew or should have known of harassment and failed to take prompt remedial action. *Andrews v. City of Philadelphia*, 895 F.2d at 1486.

Bouton contends that the grievance procedure BMW offered was insufficient to relieve it of liability and it should therefore be held liable under the negligence principle of *Restatement* § 219(2)(b). She cites a Ninth Circuit case for the proposition that the existence of a grievance procedure does not insulate an employer from liability as a matter of law. *EEOC v. Hacienda Hotel*, 881 F.2d 1504, 1516 (9th Cir. 1989). *Meritor* allowed for the possibility that an employer could escape liability if the procedure was sufficiently effective. *Meritor*, 477 U.S. at 73.

All of the witnesses who worked for BMW (save one who was not asked) testified that the company has an "open-door policy" for reporting grievances. The President, Dr. Gunter Kramer,

explained that he began the open-door policy when he started to work at BMW and continuously advertised it.  Complaints about a supervisor could be lodged with any of the supervisor's peers or superiors or the Human Resources Department.  Bouton used each of these avenues to register grievances while employed at BMW.[3]

Bouton fails to distinguish her own refusal of a potentially effective grievance procedure from the *Hacienda Hotel* employee who did not try to use an obviously ineffective procedure.  BMW investigated upon her first contemporaneous complaint of harassment.  Although Bouton had previously complained frequently to members of the Human Resources Department, she did not report any incidents that they considered to be sexual harassment.[4]  Indeed, when queried, she indicated that she did not believe she had been sexually harassed and did not want an investigation.  If she had reported any event involving unwelcome touching or that the personnel department viewed as sexual harassment, personnel managers testified—and she agreed—that the company would have investigated regardless of her

---

[3]Bouton apparently felt so comfortable with her right to communicate to senior management that she circulated a petition suggesting Hammermueller's further promotion to chief financial officer.  She withdrew it when the President explained to her why the petition was inappropriate.

[4]In addition to the three representatives of the Human Resources Department, four women who worked with Bouton testified that Bouton complained incessantly about both personal and personnel problems, but never described anything that they considered to be sexual harassment.  Furthermore, they said they never witnessed any acts that would contribute to a hostile environment.  On the contrary, Bouton reported things such as "Mr. Hooser had not noticed her new earrings, that she had been at work for an hour, over an hour, and he had not noticed her new earrings.  Trude said that is — that is clearly sexual harassment."

wishes. The "dictation incident" was the first episode that she timely complained about. Her other reports recounted occasions that had since grown stale by the passage of weeks or months. Therefore, Human Resources did not previously perceive a need to investigate.[5]

Bouton also complains that the remedy was inadequate as a matter of fact because Duenzl's transfer was planned before her complaints. She appears to propose that BMW should assign her to a third boss just because she complained about Duenzl after a transfer to Hooser was planned. She ignores the fact that her own transfer had not been decided[6] and that the remedy does not become ineffective solely by virtue of dual motives. In this case, the district court found that BMW acted promptly and effectively when it was notified of possible harassment, so BMW may not be held liable under a negligence theory.

The legal effect of a grievance procedure when a judgment is requested under a theory other than negligence or if the

---

[5] When Bouton later protested that Hooser told her to act more like a woman, Kevin Clark, the Human Resources Development Manager, investigated promptly. Clark's investigation revealed that Hooser recalls saying he "told her that she should be more human, she should be more humane to the people, not act as arrogant to the people."

[6] She claims that "[I]t was undisputed that it was BMW's policy that the secretary of a particular department would stay with that particular department so that the new person would know the procedure and have a more simple transition period." It was clearly disputed and proven to be untrue by her own employment history. She transferred with Hammermueller when he was promoted from Controller to Treasurer. Members of the Human Resources Department testified that her position upon Hooser succeeding Duenzl was not decided until a week after she began her medical leave. Indeed, she claims Duenzl insisted that she transfer with him. These facts repudiate her purported belief.

harassment is not alleviated due to a failure to complain or a failure of the procedure remains unresolved. Bouton asks us to grant relief from the employer regardless of any grievance procedure. For the answer we look to the last available option in the *Restatement*.

*Restatement* § 219(2)(d) imposes liability on the master when:

> the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

This section appears to provide multiple theories, but they all dovetail.

The final phrase of § 219(2)(d) poses an issue whether the perpetrator was aided by the existence of the agency relation. The relationship can aid a harasser in two ways. First, employment provides proximity. However, access to the victim is provided by the employment of either a supervisor or a co-worker. Most courts agree that negligence principles are appropriate when resolving liability for a co-worker's actions. *See, e.g.*, *Hunter v. Allis-Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1422 (7th Cir. 1986). Therefore, the task is to distinguish supervisors and co-workers. The second way the relationship can aid the tortfeasor is by giving the harasser power over the victim—this is analyzed as apparent authority.

Bouton's strongest argument for holding BMW liable is that Duenzl was such a high-level executive that his acts are attributable to the company. There is intuitive appeal to

imposing liability for the torts of high-level executives because they may speak for the company whenever they open their mouths. *See Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 64 (2d Cir. 1992). On the other hand, Duenzl was not sufficiently powerful to be wielding actual authority: Bouton did not believe acts of harassment were BMW policy—she believed she had a remedy by speaking to Duenzl's boss, the president of the company.

Apparent authority is invoked by the two purest implementations of *Meritor*'s instruction to use agency principles for guidance. Eleventh Circuit employer liability law has evolved over several hostile environment cases so that it now requires considering the authority of the harasser over the plaintiff and the structure of the workplace to determine whether the perpetrator is an agent under the EEOC guidelines. *Vance v. Southern Bell Tel. & Tel. Co.*, 863 F.2d 1503, 1515 (11th Cir. 1989), *rev'd on other grounds*, *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989). Prompt remediation by the employer will absolve it of liability. *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1316 (11th Cir. 1989). A post-*Meritor* law review article suggests using an agency test that considers whether the harasser had the power to hire, fire, promote, or discipline the plaintiff in both hostile environment and quid pro quo cases. David Holtzman & Eric Trelz, *Recent Developments in the Law of Sexual Harassment: Abusive Environment Claims After* Meritor Savings Bank v. Vinson, 31 St. Louis U.L.J. 239, at *16–17 (1987). If the harasser was an agent of the employer, the

employer is liable. Any grievance procedure offered by the employer is relevant exclusively to the plaintiff's remedy.

Several district courts have refused to impose liability under § 219(2)(d) when the employee could not have believed (or at least did not believe) harassment was the employer's policy, thus erasing the appearance of authority. *See, e.g.*, *Watts v. New York City Police Dep't*, 724 F. Supp. 99, 106 n.6 (S.D.N.Y. 1989) (opining that § 219(2)(d) liability is appropriate "if the conduct is accomplished by means furnished to the supervisor by his employer (such as the supervisor's influence or control over hiring, job performance evaluations, work assignments, or promotions), and the employer has not put in place strong policies and procedures that effectively belie the appearance of such authority"); *Schroeder v. Schock*, 42 Fair Empl. Prac. Cas. 1112 (BNA), 1986 WL 15483, at *4 (D. Kan. Dec. 29, 1986) ("The capacity of any person to create a hostile or offensive environment is not necessarily enhanced or diminished by any degree of authority which the employer confers upon that individual. When a supervisor gratuitously insults an employee, he generally does so for his reasons and by his own means. He thus acts outside the scope of the authority he possesses as a supervisor. His conduct cannot automatically be imputed to the employer any more so than the conduct of an ordinary employee.").

These district courts vary in the perspective from which they view whether the authority to harass has been communicated or repudiated. One proposes that "the supervisor must `purport to act on behalf of the [employer] by his inappropriate actions

toward plaintiff.'" *Andresen v. McDonnell Douglas Corp.*, 55 Fair Empl. Prac. Cas. 525 (BNA), 1991 WL 96053, at *4 (D. Utah Feb. 21, 1991) (quoting *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 579 (10th Cir. 1990)). Another looks to the message sent by the employer. *Fields v. Horizon House, Inc.*, 1987 WL 26652, at *4 (E.D. Pa. 1987) ("[A]pparent authority exists only if it is reasonable for the third party (victim) to believe that the agent is authorized in his actions. . . . [I]t would surely be rare under traditional agency principles where in non-quid pro quo sexual harassment cases an employer could be found to have communicated to his employee that the employee's supervisor had the authority to sexually harass the employee by creating an hostile working environment."). As a third alternative, an objective view may be appropriate. *Young v. Mariner Corp.*, 56 Empl. Prac. Dec. ¶ 40814, 1991 WL 172927, at *27 (N.D. Ala. Apr. 23, 1991) (concluding that the employer's policy against sexual harassment and an effective grievance procedure divested the boss of any actual or apparent authority to harass the plaintiff).

Our agency precedent requires the belief in the agent's apparent authority to be reasonable before the principal will be bound. *Reading Co. v. Dredge Delaware Valley*, 468 F.2d 1161, 1163 (3d Cir. 1972). This theory reconciles the exonerating effect of a remedial policy, which appears to stem from the negligence principles of § 219(2)(b), with the apparent authority theory of § 219(2)(d). It also indicates that the reasonableness

of the employee's perception of the combined message from the harasser and the employer is important.

The lack of a separate, written grievance policy for sexual harassment is not dispositive.[7] BMW's policy on sexual harassment was stated most succinctly by Hooser: "there will be none"; the other managers agreed. It was also clear to all who testified that sexual harassment complaints could be pursued through the general grievance procedures.

Although rarely explicitly recognized, the choice whether to permit a grievance procedure to alleviate liability under § 219(2)(d) is a policy decision based on the appropriate amount of deterrence. If employers are liable whenever supervisors harass their subordinates, they have an economic incentive in the amount of the potential judgments to recruit, train, and supervise their managers to prevent hostile environments. *Cf. Horn v. Duke Homes, Div. of Windsor Mobile Homes, Inc.*, 755 F.2d 599, 605 (7th Cir. 1985) (endorsing strict liability as the appropriate incentive level prior to *Meritor*). The marginal reduction in the incentive that occurs if employers can rely on an internal grievance procedure may be justified by the concomitant decrease in litigation. This rationale is supported by the statutory policy that requires complaint to the EEOC and a conciliation process before a complainant has a right to sue.

---

[7]Bouton included material on this subject in her appendix that was not part of the trial record and of which opposing counsel was not advised during preparation of the appendix. This, of course, is impermissible. *See* Fed. R. App. P. 30(a)-(b). BMW's Motion to Strike will be granted.

*See* 42 U.S.C. § 2000e—5. *See generally* Comment, *When Should an Employer Be Held Liable for the Sexual Harassment by a Supervisor Who Creates a Hostile Work Environment? A Proposed Theory of Liability*, 19 Ariz. St. L.J. 285, 321 (1987) (suggesting that the policies of Title VII may be best served by permitting employers to escape liability if they take prompt remedial action).

Finally, Bouton complains that "[b]y its admission, BMW's `remedial measures' (which proportedly [sic] included Bouton's `transfer' from Duenzl to Hooser and Dr. Kramer's conversation with Duenzl) all took place *after* Bouton sustained those injuries . . . ." The *Andrews* rule envisions prompt remedial action *when the hostile environment is discovered*. *Andrews*, 895 F.2d at 1486. "Remediation" contemplates curing an existing problem—a line cannot be erased until it has been drawn.

In sum, we hold that an effective grievance procedure—one that is known to the victim and that timely stops the harassment—shields the employer from Title VII liability for a hostile environment. By definition, there is no negligence if the procedure is effective. A policy known to potential victims also eradicates apparent authority the harasser might otherwise possess. Because the complaint mechanism was well known to Bouton and further harassment was prevented in response to her first contemporaneous complaint, we have no occasion to pass upon the outcome if Bouton did not understand the procedure or the initial attempt at a remedy was not successful. The district court correctly concluded that BMW is not liable for Duenzl's acts under Title VII.

## III. The New Jersey Law Against Discrimination Claim

### A. NJLAD Employer Liability

By modest extension of *Vandenbark v. Owens-Illinois Glass Co.*, 311 U.S. 538 (1941), this court is required to apply the current, definitive statement of New Jersey law. *Vandenbark* requires federal courts to revise their opinions in diversity cases still on direct review when an intervening decision of the highest state court changes the result. *Id.* at 543. More precisely, it requires reconsideration in cases controlled by the Rules of Decision Act. *Id.* The Rules of Decision Act arguably is also the source of authority for applying state statute of limitations to state law claims brought under supplemental jurisdiction. *See* 28 U.S.C. § 1652; 28 U.S.C. § 1367. Therefore, federal courts should change their rulings on pending

supplemental jurisdiction claims upon a change in relevant state law.

Since this case was submitted to the jury, the New Jersey Supreme Court has spoken on the standards for employer liability under NJLAD. When the district court charged the jury, it predicted that New Jersey would impose strict liability based on a New Jersey Appellate Division decision. Op. at 16 (citing *T.L. v. Toys `R' Us, Inc.*, 605 A.2d 1125, 1138, 255 N.J. Super. 616, 639-40 (App. Div. 1992)). After that opinion, the New Jersey Supreme Court held that strict liability is appropriate only for equitable remedies, but agency principles should be applied for compensatory damages, and more than negligence is required for punitive damages. *Lehmann v. Toys `R' Us, Inc.*, 626 A.2d 445 (N.J. 1993)).

Applying the pertinent facts to the agency principles set forth in part II, BMW is not liable under the New Jersey Law Against Discrimination. The same acts that divested Duenzl of apparent authority under federal law also prevented him from rendering BMW liable for compensatory damages under New Jersey state law.

**B.      The Statute of Limitations**

Because we have held that BMW is not liable under NJLAD, we need not address Bouton's challenge to the district court's ruling that the statute of limitations bars her NJLAD claim.

## IV.    Conclusion

On this record, the district court correctly applied the agency principles required by *Meritor* to hold that BMW is not liable under Title VII.  Now that the New Jersey Supreme Court has held these same principles applicable to its state law, they must be implemented by relieving BMW of liability under NJLAD.

The judgment of the district court will be affirmed.