**Lisa Ann MINCIN, Plaintiff,**

v.

**SHAW PACKING COMPANY and Fred McCready, Defendants.**

**Civil Action No. 96–75J.**

United States District Court, W.D. Pennsylvania.

Dec. 30, 1997.

C. Wayne Hippo, Jr., Evey, Routch, Black, Dorezas & Magee, Hollidaysburg, PA, for Lisa Ann Mincin.

Carl P. Beard, David B. Consiglio, Robert J. Tribeck, Andrews & Wagner, Altoona, PA, for Shaw Packing Company.

Anthony J. Zanoni, Hollidaysburg, PA, for Fred McCready.

## MEMORANDUM AND ORDER

D. BROOKS SMITH, District Judge.

### I.  Introduction

Dispositive motions filed in this Title VII action require me to resolve two substantial issues.  First, did an employer take "prompt and adequate remedial action" after it received actual notice of allegations by a female employee that she was being sexually harassed by a male employee.  The defendant, Shaw Packing Company, has moved for summary judgment, contending that its remedial efforts were effective.  Because there is a genuine issue of material fact regarding the adequacy of the remedial action, summary judgment on the Title VII claim will be denied.

The other issue is whether the administrative processing of plaintiff's charge of discrimination tolls the running of the statute of limitations for her pendent state law claims. Defendants, Shaw Packing and Fred McCready, contend that the administrative proceeding does not toll the statute of limitations and that plaintiff's state law claims must be dismissed as untimely.  I agree and will grant summary judgment for the defendants on the pendent state law claims.

### II.  Facts and Procedural History

Shaw Packing Company is a meat packing company located in Newry, Pennsylvania. Plaintiff began working in Shaw Packing's packaging room shortly after she graduated from high school in 1988.  After leaving briefly to work for another employer, she returned in 1991 to work in Shaw's quality control office.  Dkt. no. 20 at 12.  Plaintiff's responsibilities included testing meat for fat and moisture, conducting inventories, ordering supplies, completing transmittal forms, and preparing ingredient statements for labels.  Id. at 15.  Her work space consisted of a small room at the back of the building, a space she often shared with McCready.  Id. at 17.

McCready was Shaw Packing's sausage maker, and his responsibilities included managing the kitchen and formulating the product.  Dkt. no. 22 at 20.  Each batch of sausage was required to undergo compliance testing, and McCready advised plaintiff on a daily basis when it was to be done.  Id.  In addition to working with McCready on compliance testing, plaintiff worked as needed in the packaging room or sausage kitchen if someone failed to report to work.  Id. at 18.

Beginning in November 1993 and continuing to February 1994, McCready allegedly persisted in a course of conduct which subjected the plaintiff to, inter alia, derogatory comments about the plaintiff which were punctuated with the four-letter "F" word, comments regarding sexual encounters that her family members allegedly had and/or should have in the future, comments regarding sexual encounters plaintiff should have with McCready and others, as well as inappropriate physical touching which included hugging, patting plaintiff's rear end and blowing down her shirt.  Dkt. no. 20 at 28–40.  Much of this conduct was committed in the presence of other non-supervisory employees.  Plaintiff confided the details of this alleged harassment to some of her co-workers.  Id.

On February 14, 1994, one of plaintiff's co-workers informed plaintiff's supervisor, Roger Carpenter, of McCready's conduct and of the distress it was causing plaintiff.  Dkt. no. 21 at 15–16.  That same day, Carpenter was also approached by his secretary who requested that he talk with plaintiff regarding problems she was having at the plant.  Id. at 17.  Carpenter heeded these requests and called plaintiff into his office the next day when she arrived for work.  After breaking down and crying, plaintiff related, over the course of an hour, what McCready had allegedly done.  Dkt. no. 20 at 41; dkt. no. 21 at 17.  Plaintiff advised Carpenter that she could not continue to endure McCready's offensive behavior, and that "she wanted them to keep him away from [her]."  Id. at 43.  Carpenter apologized for what had happened and indicated he would take action.  Id. at 42.

Carpenter contacted Richard Shaw, the president of Shaw Packing, immediately after the plaintiff left his office.  Carpenter and Shaw agreed to meet with McCready the following morning.  They "sat down with [McCready] and discussed these allegations

pertaining to him and he denied every one of them." Dkt. no. 21 at 19. Carpenter affirmed in his deposition that

"no action [was] taken at this time. What I did, I said okay, I said [to McCready] until I can come back from our meeting on Wednesday, I want you to talk to Lisa pertaining to this situation. And I said I want to see that this is ironed out or settled."

Shaw also testified that he instructed McCready to apologize because he "want[ed] this thing resolved." Dkt. no. 22 at 49.

Shaw viewed plaintiff's allegations about McCready as simply a "difference of opinions" and believed that "there was no reason to isolate her." Dkt. no. 22 at 58. He further opined that "[t]here wasn't anything to protect her from" before her resignation. *Id.* He explained that "[i]f this would have been two men, I would put them in a room and told [sic] them to fight it out." *Id.* Besides telling McCready to apologize, Shaw did not take any other immediate action to address plaintiff's complaints. *Id.*

Consistent with Carpenter's and Shaw's instructions, McCready approached the plaintiff as she was sitting at her desk the following day. Plaintiff related that

[h]e locked the door behind him and wanted to know why I told on him, said that he never did it. He never harassed me, he never said this, he never said that. And then he turned around and said that he did. And that he was sorry. That he did. That he don't know why he did it.

Dkt. no. 20 at 47–48. According to the plaintiff, "[h]e didn't apologize, he didn't mean it. He said he was sorry because he had to say he was sorry. He did not apologize. He was mad at me." *Id.*

Carpenter checked with plaintiff the following day to inquire if McCready had approached her as instructed. Plaintiff advised Carpenter that McCready had apologized and Carpenter inquired if she was "happy." *Id.* at 51. *See also* dkt. no. 21 at 23. Plaintiff replied that she was, and again asked about "where the barriers were" so that she could be physically isolated from McCready. *Id.* Carpenter then pulled McCready from

the plant floor and "said I understand the situation has been cleared up[ ] ... and I want to thank you for taking care of it. And that was—that's what happened then. So Friday [plaintiff] came to work again" and Carpenter thought that the problem between plaintiff and McCready had been resolved. Dkt. no. 21 at 24. Carpenter advised Shaw that McCready had apologized, and told him plaintiff had "accepted it and everything is fine." Dkt. no. 22 at 52.

Plaintiff admits she did not inform Carpenter that McCready "had locked the door and wasn't too happy," but she "figured, if [Carpenter and Shaw] were going to tell him that I told on him, what should I do? What was I supposed to do?" Dkt. no. 20 at 52. She also failed to report to her employer that McCready's brother had come into her office sometime after McCready apologized, blew in her face and told her she was "worthless." *Id.* at 53. Plaintiff explained:

Why should I tell them, I told him what Fred did and they sent him back, back to my office. No, I didn't tell them any more [sic]. They weren't helping me. They weren't doing anything. What was I supposed to do?

Dkt. no. 20 at 54.

Plaintiff reported for work on Friday and again found that room dividers had not been installed in her office. While she was sitting at her desk and McCready was sitting at his table, she noticed that he was staring at her. After about twenty minutes, plaintiff asked McCready why he was staring. In response, he "grabbed his crotch and he winked at me." *Id.* at 56. Plaintiff left the plant at that point and did not return. On February 23, 1994, the company received a letter from plaintiff that indicated she was resigning due to sexual harassment. Dkt. no. 20, exh. 3. Carpenter was surprised that plaintiff quit because he thought the problem between her and McCready had been addressed. He conceded that the dividers plaintiff had requested were never installed, but claimed that plaintiff had not given her employer an adequate opportunity. Dkt. no. 21 at 39–40.

Upon receipt of the plaintiff's letter of resignation, Shaw, Carpenter and Bill Butler, another management employee, contacted

the company's attorney. Thereafter, on March 3, 1994, Carpenter sent a letter to plaintiff noting that her resignation was unexpected since the company's understanding was that the matter had "been handled to your satisfaction." Dkt. no. 20, exh. 4. The letter expressed the hope that plaintiff would return and the company's willingness "to meet with you at any time to discuss whatever problem caused you to resign. . . ." *Id.* A follow-up letter on March 8 advised the plaintiff that the company was conducting an I investigation "in order to take action against whoever was responsible." *Id.*, exh. 5. This letter requested that she contact the company to assist in the investigation, even if she did not intend to return to work. *Id.*

The investigation consisted of having each employee complete a questionnaire which consisted of four questions. The questions inquired whether that employee had ever been subjected to any verbal or physical sexual harassment from McCready, or had witnessed such behavior, and whether they believed McCready would or could engage in conduct which would offend others because of its sexual content. The questionnaires were completed on March 1, 1994. Dkt. no. 23, exh. 1. Carpenter concluded that "[n]inety (90) percent of the response was against Mr. McCready." Dkt. no. 21 at 36. Carpenter believed that McCready should have been fired, but the recommendation by Carpenter, Shaw, and Butler, after consultation with the company's attorney, was that McCready should be suspended instead. *Id.* at 36–37. McCready received a Notice of Disciplinary Suspension of Employment from Shaw on March 14, 1994. The notice advised him that he was suspended for three days without pay and that "any additional acts of unlawful harassment on your part, *including* any form of retaliation, will result in immediate disciplinary action by the Company, up to and including the permanent termination of your employment with this Company." Dkt. no. 22, exh. 1. Carpenter testified in his deposition, however, that McCready was suspended only for purposes of the record and that he suffered no actual sanctions. Dkt. no. 21 at 36–38. After plaintiff's resignation, Shaw

Packing enacted a company policy forbidding sexual harassment. Dkt. 22 at 72, exh. 3.

Plaintiff filed a complaint with the Pennsylvania Human Relations Commission (PHRC) on March 16, 1994. Dkt. no. 35, exh. A. The complaint named Shaw Packing and McCready as respondents, but the cover sheet indicated that the only respondent was Shaw Packing. *Id.* Subsequent correspondence from the Equal Employment Opportunity Commission (EEOC) likewise indicated that the only respondent was Shaw Packing. *Id.*, exh. B, C. The EEOC issued a Notice of Right to Sue on February 9, 1996 because "more than 180 days have expired since the filing of the charge," and copied the same to respondent Shaw Packing Company. *Id.*, exh. C.

Plaintiff filed the complaint in this action on April 10, 1996. She alleged that both Shaw Packing and McCready had violated Title VII of the Civil Rights Act of 1964. Dkt no. 1. She also pleaded pendent state claims against Shaw Packing, alleging that it was liable for intentional infliction of emotional distress (IIED) and negligence in failing to adequately train its employees with respect to sexual harassment. *Id.*, counts IV and VI. The complaint also asserted IIED and false imprisonment claims against McCready. *Id.*, counts III and V.

After an initial case management conference, plaintiff dismissed her Title VII claim against McCready in light of *Dici v. Com. of Pennsylvania*, 91 F.3d 542, 552 (3d Cir.1996) ("individual employees cannot be held liable under Title VII"). Both defendants filed motions for summary judgment after the conclusion of discovery. Shaw Packing contends that, because it took effective remedial action once plaintiff notified it of McCready's offensive conduct, summary judgment should be granted in its favor. It further contends that plaintiff's prayer for back pay should be dismissed because such relief cannot be granted absent a constructive discharge claim, and that summary judgment should be granted on the pendent state claims because the plaintiff failed to commence this action within the two year statute of limitations.[1]

---

1. McCready also argues that plaintiff's state law claims fall because this action was not com-

Plaintiff disputes the efficacy of Shaw Packing's response to her report of a sexually hostile work environment and asserts that her prayer for back pay is consistent with Title VII jurisprudence. She also contends that the two year statute of limitations was tolled by virtue of her filing an administrative complaint with the PHRC, and that her pendent state claims should survive the motion for summary judgment.

### III. *Summary Judgment Standard*

Summary judgment shall be "rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Accordingly, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986).

Once the moving party has satisfied its burden, the nonmoving party is required by Federal Rule of Civil Procedure 56(e) to go beyond the pleadings by way of affidavits or other admissible evidentiary material to establish that there is a genuine issue of material fact for trial. *Clark v. Clabaugh*, 20 F.3d 1290, 1294 (3d Cir.1994). That is, the nonmoving party "may not rest upon mere allegation or denials of [her] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) (citing Fed. R.Civ.P. 56(e)).

A fact is "material" if it "might affect the outcome of the suit under the governing law...." *Id.* at 248, 106 S.Ct. at 2510. A material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 258, 106 S.Ct. at 2515.

In determining whether a nonmovant has established the existence of a genuine issue of material fact requiring a jury trial, the evidence of the nonmovant must "be believed and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. Whether an inference is justifiable, however, depends on the evidence adduced. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 595–96, 106 S.Ct. 1348, 1360–61, 89 L.Ed.2d 538 (1986).

### IV. *Applicable Law: Title VII and Remedial Action*

■ In *Andrews v. City of Philadelphia*, 895 F.2d 1469 (3d Cir.1990), the Third Circuit established five elements necessary to assert a successful hostile work environment claim:

> (1) the employee[ ] suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.

*Id.* at 1482. In a hostile work environment case, the plaintiff usually endeavors to establish respondeat superior liability based on the employer's "own negligence or recklessness: in this context, an employer is liable for 'negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment.'" *Knabe v. Boury Corp.*, 114 F.3d 407, 411 (3d Cir.1997) (quoting *Bouton v. BMW*, 29 F.3d 103, 106 (3d Cir.1994)). "[P]rompt and effective [remedial] action by the employer will relieve it of liability." *Bouton*, 29 F.3d at 107.

■ "Remedial action is adequate if it is reasonably calculated to prevent further harassment." *Knabe*, 114 F.3d at 411 n. 8. In *Knabe*, the court affirmed the district court's conclusion that the employer's remedial action was adequate as a matter of law despite the fact that it did not punish the

menced within two years of the offensive conduct, but otherwise relies upon and incorporates

Shaw Packing's brief.

alleged perpetrator. Upon notification by the plaintiff of the sexually hostile work environment created by her immediate supervisor, the employer immediately conducted an investigation. The employer concluded that it could not make a finding, without a corroborating witness, that the supervisor had harassed the plaintiff. Nevertheless, the employer warned the supervisor that the company would not tolerate any further misconduct and that any subsequent offense would result in suspension or termination. The supervisor was directed to return the plaintiff to the work schedule, and plaintiff was provided with the name of several company officials whom she could contact in the event of further offensive conduct.

The Third Circuit concluded that the employer's actions were adequate, even though they did not include a reprimand, because the supervisor "was made aware of his responsibilities, and [plaintiff] was made aware of her rights in case of future improper conduct. [Plaintiff] has presented no evidence that there would have been a hostile work environment had she returned or that [her supervisor] would have felt free to continue his harassment upon her return to work." *Id.* The court reasoned:

> Whether a nonpunitive remedy is reasonably calculated to end the harassment is, to a certain extent, a function of the severity and frequency of the harassment, and is a highly fact-specific inquiry. The more severe and more frequent the harassment, the less likely a nonpunitive remedy will be found adequate.

*Id.* at 414. "The question whether a chosen remedy was reasonably calculated to prevent further acts of harassment can be answered at the time that remedy is put into place." *Id.* at 415.

## V. *Effectiveness of Shaw Packing's Remedial Action*

■ Shaw Packing argues that it acted promptly once notified by the plaintiff by confronting McCready the day after the allegations. Plaintiff does not attack the timeliness of her employer's response. She does, however, challenge its adequacy. Shaw Packing notes that the plaintiff admitted she was "happy" and that "any objective trier of fact would have to conclude [that] management believed that it had resolved the situation in one day." Dkt. no. 19 at 5. According to Shaw Packing, the effectiveness of its remedial efforts is evident because it conducted the investigation despite the plaintiff's abrupt resignation without notice, and despite her failure either to report McCready's offensive conduct following his apology or to cooperate with the investigation. Shaw Packing contends that the *Knabe* case compels summary judgment in its favor because the Third Circuit "unequivocally stated that it is 'clear that a plaintiff cannot survive summary judgment merely by failing to return to his or her job after the remedial action at issue is taken.'" Dkt. no. 43 at 3 (quoting *Knabe*, 114 F.3d at 415).

■ My determination of whether Shaw Packing's remedial action was adequate as a matter of law is based on its response to the plaintiff's initial complaint about McCready. *See Knabe*, 114 F.3d at 415 (stating that the efficacy of an employer's response "can be answered at the time that remedy is put into place"). Accordingly, Shaw Packing's investigation and its adoption of a company policy prohibiting sexual harassment is largely irrelevant to the inquiry of whether its response to plaintiff's initial complaint was adequate and sufficient to relieve it from liability.[2] These steps were precipitated by the plaintiff's eventual resignation, not by the plaintiff's initial disclosure to Carpenter of McCready's offensive conduct. Both Carpenter and Shaw were clear that the remedial efforts taken upon notification from the plaintiff were limited to confronting McCready with the allegations, demanding that he apologize or resolve the controversy, checking with plaintiff to determine if an

2. Although the investigation and implementation of a sexual harassment policy are, in this case, irrelevant to liability, Shaw Packing's subsequent remedial changes may well bear on the extent of plaintiff's damages. If the jury finds that those efforts were adequate to eliminate the sexually harassing work environment, it could rationally conclude that the plaintiff suffered injury only until the time the remedial efforts were completed, given Shaw Packing's open offer to her to return to work.

apology had been offered, and a promise by Carpenter to erect some type of barrier in plaintiff's office to isolate her.

My determination of whether these remedial steps were adequate as a matter of law is also informed by the absence of certain responses by management. *See id.* (recognizing that the absence of a punitive remedy in some cases will render remedial action inadequate). First, I find it notable that Shaw Packing's response is devoid of any explicit direction to McCready to refrain from further offensive conduct. Carpenter and Shaw both demanded an apology or resolution of the matter, but neither manager specified that the company would not tolerate such conduct in the future.

Moreover, while Carpenter was himself apologetic to plaintiff, his assurances failed to make her "aware of her rights in case of future improper conduct." *Id.* at 413. This omission is significant because the company did not have, at that time, a policy advising employees what to do in the face of unwanted sexual conduct and plaintiff testified that she did not know what to do when confronted with McCready's forced apology, his brother's "blowing" in her face and McCready's grabbing of his crotch and winking. Dkt. no. 21 at 48–53.

Finally, management failed to actually investigate plaintiff's allegations. Instead, the company simply confronted McCready and demanded that he resolve the matter by making an unsupervised apology. This response is a far cry from what the *Knabe* panel had in mind when it admonished employers that they "would be well advised to establish protocols to ensure careful and complete investigation of sexual harassment complaints." 114 F.3d at 412 n. 10. *See also Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987) (noting that employer is obliged to investigate employee's allegations).

The totality of the circumstances which prevailed around the time of plaintiff's initial complaint, together with the failure of plaintiff to file a motion for partial summary judgment on this issue, render the determination of whether Shaw Packing took prompt and effective remedial action a question for a jury.[3] Accordingly, Shaw Packing's motion for summary judgment, dkt. no. 15, will be denied with respect to the Title VII claim.

█ Whether Shaw Packing's conduct is such that plaintiff may also have a constructive discharge claim entitling her, *inter alia,* to backpay, is also for the jury's consideration. The undisputed facts could give rise to an inference that the "employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 888 (3d Cir.1984).

## VI. *Statute of Limitations*

Shaw Packing and McCready both assert that the pendent state claims should be dismissed due to the plaintiff's failure to commence this action within the applicable two year statute of limitations.[4] Plaintiff contends that her state law claims

> should not be time-barred because the applicable statute of limitations … was tolled by the filing of her complaint with the EEOC and because [plaintiff] properly filed her state law claims with her Title VII claims within the applicable 90 days following the EEOC issuance of a "right to sue" letter.

Dkt. no. 26 at 2–3.

I need not address the question of whether the statute of limitations for the state law claims are tolled by the administrative processing of an allegation of discrimination as it pertains to McCready. Although the initial PHRC complaint prepared by plaintiff's counsel designated both Shaw Packing and McCready as respondents, the PHRC and the EEOC did not consider McCready a respondent. The PHRC cover sheet indicat-

---

**3.** The undisputed facts are subject to an inference that Shaw Packing was less than vigorous in addressing plaintiff's complaint, and that it initiated the investigation only in response to the plaintiff's resignation, and out of fear of legal liability.

**4.** It is undisputed that the two year limitations period of 42 Pa.C.S.A. § 5524(1) and (7) is applicable to the state law claims.

ed that the only respondent was Shaw Packing. Dkt. no. 35, exh. A. The EEOC's letter acknowledging receipt of the plaintiff's complaint of employment discrimination also designated Shaw Packing as the sole respondent. *Id.* exh. B. The EEOC's Notice of Right to Sue issued February 9, 1996 was copied to respondents and Shaw Packing was the single entity designated. For that reason, I conclude that the administrative processing of plaintiff's complaint of employment discrimination by Shaw Packing failed to toll the statute of limitations for plaintiff's state law claims against McCready and those claims will be dismissed.

■ The question remains whether the statute of limitations was tolled for plaintiff's state law claims against Shaw Packing as the respondent named in the administrative proceeding. Generally, a federal court must apply state law in ascertaining whether a state statute of limitations has been tolled. *Vernau v. Vic's Market, Inc.,* 896 F.2d 43, 45 (3d Cir.1990). Because the Pennsylvania Supreme Court has yet to decide whether the statute of limitations for state tort claims should be tolled by the administrative pendency of a related charge of discrimination, I must predict how that court would rule. *McGowan v. University of Scranton,* 759 F.2d 287, 291 (3d Cir.1985). Although not controlling, the decisions of the intermediate appellate state courts may be indicative of how the Pennsylvania Supreme Court would decide the issue. *Id.* (quoting *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981)).

■ In Pennsylvania, the statutory period "commences at the time the harm is suffered...." *Bailey v. Tucker,* 533 Pa. 237, 621 A.2d 108, 115 (1993). "As a matter of general rule, a party asserting a cause of action is under a duty to use all reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based, and to institute suit within the prescribed statutory period." *Pocono Int'l Raceway v. Pocono Produce, Inc.,* 503 Pa. 80, 468 A.2d 468, 471 (1983). As a consequence, "lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." *Id.* The expiration of the statutory period will bar a party from bringing suit unless that party can establish "that an exception to the general rule applies which acts to toll the running of the statute." *Id.*

■ The discovery rule is one exception recognized in Pennsylvania. *Id.* This exception is applicable in those instances where the plaintiff is unable, "despite the exercise of diligence ..., to know of the injury." *Id.* In such an instance, the statute of limitations does not run until the injury or its cause is discovered or is "reasonably possible" to discover. *Schaffer v. Larzelere,* 410 Pa. 402, 189 A.2d 267, 270 (1963). The running of the statute of limitations may also be tolled if there is fraud or concealment by the defendant. In *Molineux v. Reed,* 516 Pa. 398, 532 A.2d 792, 794 (1987), the court recognized the governing principle relevant to such a claim of estoppel:

> Where, "through fraud or concealment, the defendant causes the plaintiff to relax his vigilance or deviate from his right of inquiry," the defendant is estopped from invoking the bar of the statute of limitations.

*Id.* (quoting *Schaffer,* 189 A.2d at 269).

■ In determining whether to toll the statute of limitations in a civil action, the Pennsylvania state courts have consistently adhered to the procedure of ascertaining when the harm was sustained, otherwise known as the "occurrence rule," *Robbins & Seventko v. Geisenberger,* 449 Pa.Super. 367, 674 A.2d 244, 246 (1996), and whether the discovery rule or doctrine of equitable estoppel is applicable. In *Bailey v. Tucker,* the Pennsylvania Supreme Court had to determine when the statute of limitations in a legal malpractice case began to run. 621 A.2d 108. The court applied the occurrence rule and the discovery rule and concluded that the statutory period in either a trespass or assumpsit action commenced when the client, the defendant in a criminal prosecution, became aware that his attorney was responsible for his harm. It rejected the concept that the statutory period commenced at the conclusion of either the direct appeal process or any collateral proceedings alleging ineffective assistance of counsel. The Su-

preme Court explained that although a plaintiff in a criminal defense malpractice case must pursue his post-trial remedies, such a course did not "relieve the plaintiff of his duty to initiate this cause of action within the statute of limitations period...." *Id.*, at 115 n. 13.

The Pennsylvania Superior Court followed this approach in *Robbins & Seventko v. Geisenberger*, 674 A.2d at 244. In *Geisenberger*, the court addressed whether the statute of limitations in a legal malpractice action was tolled during the pendency of an administrative appeal. The appellants, a group of physicians, retained their former counsel to prepare and file an employee pension plan with the IRS. The plan "failed to qualify, and the deductions made to it in 1976, 1977, 1978 and 1979 were disallowed." *Id.* at 245. An IRS notice of the same was received by the physicians in May 1983, after which new counsel filed an unsuccessful appeal with the IRS. After receiving notice from their new counsel in January 1988 that administrative remedies had been exhausted, the physicians filed a malpractice suit against their former counsel in December of that year.

The physicians argued that the statute of limitations was tolled during the pendency of the administrative appeal and that the statutory period began to run when they received notice from their new counsel that the IRS appeals were exhausted. The Superior Court relied upon the Supreme Court decision in *Bailey* and rejected the physicians' argument that the pendency of the appeal warranted tolling of the statutory period. *Id.* at 247 (quoting *Bailey*, 621 A.2d at 115). Instead, it focused upon when the harm was suffered and when the physicians acquired knowledge of it. The court then concluded that the physicians were aware of the harm

when they received notice in May of 1983 disallowing certain deductions. Accordingly, the court affirmed the grant of summary judgment in favor of the physicians' former counsel.

Given the reluctance of the Pennsylvania courts to stray from the occurrence rule, the discovery rule and the doctrine of equitable estoppel, *Bailey, supra, Geisenberger, supra,* I predict that the Pennsylvania Supreme Court would not toll the statute of limitations for related state tort claims because of the pendency of a discrimination charge before the PHRC/EEOC.

Requiring a plaintiff to initiate suit within the statutory time period despite the pendency of a related administrative proceeding is also consistent with the Supreme Court's holding in *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). There, the Court held that the administrative processing of a Title VII claim before the EEOC does not toll the statute of limitations for a § 1981 claim. It observed that the "filing of a Title VII charge and resort to Title VII's administrative machinery are not prerequisites for the institution of a § 1981 action" and reasoned that "although related, and although directed to most of the same ends, [Title VII and § 1981] are separate, distinct and independent remedies." *Id.* at 460–61, 95 S.Ct. at 1720–21. In light of the independent nature of these two avenues of redress, the Court concluded that there is no need to toll the statute of limitations and "excuse[ ] [plaintiff's] failure to take the minimal steps necessary to preserve each claim independently." *Id.* at 466, 95 S.Ct. at 1723.[5]

Accordingly, consistent with the approach laid out in *Bailey* and *Geisenberger*, which I

---

**5.** The Court recognized that

failure to toll will have the effect of pressing a civil rights complainant who values his § 1981 claim into court before the EEOC has completed its administrative proceeding. One answer to this, although perhaps not a highly satisfactory one, is that the plaintiff in his § 1981 suit may ask the court to stay proceedings until the administrative efforts at conciliation and voluntary compliance have been completed.

*Id.* at 465, 95 S.Ct. at 1722–23. *See also Juarez v. Ameritech Mobile Communications, Inc.*, 957

F.2d 317, 322–23 (7th Cir.1992) (rejecting plaintiff's argument that statute of limitations for state law claims should be tolled by filing of her EEOC charge because of separate and independent nature of claims); *Arnold v. United States*, 816 F.2d 1306, 1312 (9th Cir.1987) (refusing to toll statute of limitations for state law claims which "vindicate[s] not her right to be free from discrimination in the workplace, but rather her right to be free from bodily or emotional injury caused by another person" (citations and internal quotations omitted)).

am bound to follow, and guided by the Supreme Court's reasoning in *Johnson,* I conclude that the plaintiff's state claims should be dismissed as untimely because they were not filed within the two year statutory period. Neither the discovery rule nor the doctrine of equitable estoppel operates to toll the limitations period. The plaintiff admits that the offensive conduct occurred when she was working at Shaw Packing between November 1993 and February 1994. Plaintiff knew not only that she had been injured, but by whom, and such knowledge imposed upon her an obligation to file suit within the prescribed period. Nor is this a case in which an employer attempted to thwart plaintiff's right to file suit in either an administrative venue or before a judicial tribunal.

Finally, the avenues of relief pursued by plaintiff are clearly independent and distinct.

An appropriate order will follow.

### ORDER

AND NOW, this 30th day of December, 1997, consistent with the foregoing memorandum, it is hereby

ORDERED AND DIRECTED that:

1. The Motion for Summary Judgment filed by defendant, Shaw Packing, docket no. 18, is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to the plaintiff's state law claims and counts IV and VI are dismissed. The motion is denied with respect to plaintiff's Title VII claim.

2. The motion for summary judgment filed by defendant McCready, docket no. 17, is GRANTED and the state law claims asserted in counts III and V are dismissed.

3. Defendant Shaw Packing's Motion to Strike the Introduction of Roger Carpenter's Affidavit, docket no. 38, is DENIED as moot inasmuch as his deposition testimony has been filed.

4. Defendant's Shaw Packing's Motion to Strike Praecipe for Filing of Documents, docket no. 32, is DENIED as moot because the documents have been filed as part of the evidentiary material in support of the plaintiff's opposition to the motions for summary judgment.

5. Counsel shall file on or before January 12, 1998 any proposed voir dire and/or motions *in limine.*

6. TRIAL COUNSEL shall attend a pretrial conference on *Tuesday, January 20, 1997, at 3:00 PM,* in Room 104, Penn Traffic Building, 319 Washington Street, Johnstown, Pennsylvania.

7. This action is listed for trial during the January 20, 1998 Johnstown Trial Term and trial counsel shall be prepared to select a jury and commence trial on 24 hours notice.